In re OZARK RESTAURANT EQUIP-
MENT CO., INC., Debtor.

James G. MIXON, Trustee, Plaintiff,

v.

Bruce ANDERSON, Elmer Dale Yancey, Kenneth Eads, Robert Whiteley and Anderson Cajun's Wharf, Defendants.

James G. MIXON, Trustee, Plaintiff,

v.

ANDERSON CAJUN'S WHARF,
Defendant.

James G. MIXON, Trustee, Plaintiff,

v.

HAYDEN McILROY OF McILROY BANK & TRUST; Ed Yancey, Bruce Anderson and Kenneth Eads, Defendants.

Bankruptcy No. FA 82–120.
Adv. Nos. AP 82–882 to AP 82–884.

United States Bankruptcy Court,
W.D. Arkansas,
Fayetteville Division.

March 21, 1984.

James G. Mixon, Bentonville, Ark., F.H. Martin, Fayetteville, Ark., for plaintiff.

Raymond H. Smith and Truman H. Smith, Fayetteville, Ark., for defendants Anderson Cajun's Wharf, Bruce Anderson, Robert Whiteley and Elmer Dale Yancey.

William Russell Gibson, Fayetteville, Ark., for defendant McIlroy Bank.

Marshall Dale Evans, Fayetteville, Ark., for defendant Kenneth Eads.

### ORDER

CHARLES W. BAKER, Bankruptcy Judge.

Before the Court are three Adversary Proceedings consolidated for trial. The hearing began on October 14, 1983. After adjournment on that date the balance of the hearing was conducted in Little Rock on November 18, 1983. Hon. James G. Mixon, Trustee, was represented by Hon. F.H. Martin. Hon. Marshall Dale Evans represented Kenneth Eads. Hon. Truman H. Smith and Hon. Raymond C. Smith represented Anderson Cajun's Wharf. The Trustee presented testimony from Carol Brooks, Elmer Dale Yancey, James Tandy, Bruce Anderson, Ron Berry, Kenneth Eads, Robert Whiteley, James G. Mixon, George Kitchens and introduced fifty-two (52) exhibits. Anderson Cajun's Wharf presented the testimony of Bruce Anderson and introduced two (2) exhibits.

The Court has jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1471 and 1481, 11 U.S.C. § 105, and General Order No. 24 of the United States District Court for the Eastern and Western Districts of Arkansas.

The Court, having researched the issues presented and being fully advised in the premises, makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. "Anderson-related entities" hereinafter will be taken to mean Anderson Cajun's Wharf in Little Rock, Cajun's Wharf in Nashville, Cajun's Wharf in Knoxville, Gonzales & Gertrude's, Port City Equipment Co., and Port City Seafood Co. Bruce Anderson owned 50% or more of the stock in each of these in 1980.

2. Anderson Cajun's Wharf, Inc. operated Cajun's Wharf restaurants in Little Rock, Nashville, and Knoxville. Bruce Anderson was the Chief executive officer of Anderson Cajun's Wharf, Inc., and Gonzales & Gertrude's. The latter is also a restaurant.

3. Bruce Anderson was a 50% shareholder and director of the debtor, Ozark Restaurant Equipment Co., Inc. Elmer Dale Yancey was also a 50% shareholder, director, and officer of the debtor. Kenneth Eads was a director and president of the debtor.

4. Port City Equipment Co. is a subsidiary of Anderson Cajun's Wharf, Inc., which sold restaurant equipment to other Anderson-related entities.

5. The debtor conducted the same type business as Port City Equipment Co. The debtor also sold its equipment to Anderson-related entities, including Port City Equipment. Port City Equipment, in fact, was the debtor's biggest account.

6. The debtor from the beginning was grossly undercapitalized. At the outset, it had liabilities of $109,000 and capital of $1,000.

7. The debtor never made a true profit and continually throughout its existence showed a negative net worth. Specifically, the debtor's negative net worth grew from a negative $1,400 on December 31, 1980 to a negative $146,000 on September 1, 1982.

8. Although normal profit margins or "markups" would, necessarily, in a profitable business comparable to the debtor's, be 25% to 30%, the debtor sold in volume to Anderson-related entities at 10% to 15% markups. Although the Court heard no evidence on the *average* markups on sales to non-Anderson-related entities, two individual sales to other customers were made at markups of 29.57% and 10.03%.

9. Bruce Anderson directed the debtor to reduce the markup from 15% to 10% in sales to his entities. Although it is impossible to determine from the evidence exactly when this occurred, from March 1981 until the debtor closed its doors, the markup was 10%.

10. Certain manufacturers, especially Libby Glass, would not sell directly to Port City Equipment. They would sell direct to the debtor, who, in turn, sold to Port City Equipment at cost plus 10%.

11. Bruce Anderson was aware of the debtor's financial condition. He clearly was aware of its status when the company was formed with $1,000 operating capital ($500 of which was contributed by him) and $109,000 in liabilities, most of which consisted of a note to the bank guaranteed by Anderson and Yancey. Subsequently, David Walker apprised Anderson, upon receipt of the income statement from the four months ending December 31, 1980, of the company's negative net worth. Anderson was aware of continuing losses after that time.

12. Robert Whiteley, a business consultant, was hired by Anderson to help the debtor cut costs, check sales, and deal with accounts payable. From the time he joined the debtor in March of 1981, Whiteley communicated the debtor's bleak financial condition to Anderson and Walker.

13. Bruce Anderson ultimately controlled the debtor. The president, Kenneth Eads, ran the debtor's daily operations. David Walker, comptroller for Anderson Cajun's Wharf, Inc., served as liason between Eads and Anderson. For example, if Eads and Robert Whiteley disagreed over a policy, they discussed it with Walker and/or Anderson.

14. In July, 1982 Bruce Anderson closed the debtor and decided to file for relief under the United States Bankruptcy Code.

15. Also in July, 1982 Bruce Anderson selected certain items from the debtor's inventory to be shipped to Port City Equipment. The total value of this equipment was $20,208.39. The debtor was never paid for this transfer.

16. Anderson-related entities purchased equipment from the debtor on credit. Payments for these purchases averaged 77 days after the date of purchase. No interest was charged or collected on these outstanding accounts.

17. Robert Whiteley and Kenneth Eads took out personal loans in order to contribute $5,000 each to the debtor. On at least three different occasions Whiteley and Eads drew money from the debtor to pay themselves back for these $5,000 contributions.

18. The debtor's net worth on the following dates was:

| | |
|---|---|
| 12–31–80 | $( 1,400) |
| 4–30–81 | ( 14,043) |
| 4–30–82 | ( 80,000) |
| 9–01–82 | (146,000) |

19. The parties stipulated that the debtor made the following payments to McIlroy Bank on the following dates:

| | |
|---|---|
| 9–09–81 | $ 4,970.52 |
| 10–09–81 | 2,485.26 |
| 11–02–81 | 2,485.26 |
| 12–24–81 | 2,485.26 |
| 1–08–82 | 2,485.26 |
| 2–19–82 | 2,485.26 |
| 4–23–82 | 2,485.26 |
| 5–10–82 | 2,641.49 |

20. In sales to Port City Equipment the debtor (a) at times did not bill Port City Equipment; (b) sold to Port City Equipment at a loss; (c) at times utilized a gross markup of 7%; and (d) sometimes used no markup at all.

21. The debtor kept no separate accounts receivable records for the various Anderson-related entities. All sales to Anderson-related entities were entered on the Port City Equipment accounts receivable ledger.

From the above and foregoing findings of fact, the Court makes the following conclusions of law:

1. 11 U.S.C. § 542(b) states: Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the Trustee, except to the extent that such debt may be offset under § 553 of this title against a claim against the debtor.

■ 2. Based on this section of the Code, the Court finds Port City Equipment liable in the amount of $20,208.39 for goods shipped to it by the debtor in July, 1982, for which payment was never received by this debtor.

3. Testimony was heard regarding a consignment of equipment from Port City Equipment Co. to the debtor. This testimony was insufficient as to the date of such alleged consignment, the terms thereof, and the value of the consigned items to form the basis of a setoff under § 553. Furthermore, this alleged debt is not listed in the debtor's schedules, Port City Equipment has not filed a proof of claim, nor could Port City Equipment produce documentary evidence at trial substantiating this debt. Defendant's Exhibit 1 purports to represent a list of items consigned. The debtor, however, denies such a consignment. Defendant's Exhibit 1 is not dated. It is addressed to no one in particular. It is not accompanied by a cover letter or memo setting out the terms of the alleged consignment. Furthermore, there is a significant conflict between the value assessed on the Exhibit ($15,000) and the value assessed by Bruce Anderson in his testimony ($10,000–$12,000). Suffice it to say, the Court is not convinced Defendant's Exhibit 1 is what Mr. Anderson claims it to be.

4. 11 U.S.C. § 547(b) states: Except as provided in subsection (c) of this section, the Trustee may avoid any transfer of property of the debtor (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made (B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer (i) was an insider; and (ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and that enables such creditor to receive more than such creditor would receive if (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

■ 5. Based on the criteria found in § 547, the Court finds the seven payments totaling $24,035.82, made by the debtor to McIlroy Bank within a year of the filing of the petition in bankruptcy, to be preferential transfers, which can be recovered by the Trustee. The one year time period is

applicable due to the fact that Anderson and Yancey were insiders and also were the creditors who benefitted from payments to McIlroy on a loan they had guaranteed. See, *Cooper Petroleum Co. v. Hart*, 379 F.2d 777 (5th Cir.1979); *Kobusch v. Hand*, 156 F. 660 (1907), *cert. denied*, 209 U.S. 547, 28 S.Ct. 758, 52 L.Ed. 720 (1908). Because of the personal guaranties by Bruce Anderson and Elmer Dale Yancey on the original $100,000 note the Bank is entitled to judgment for $24,035.82 over against the guarantors.

6. Furthermore, because the original loan is in default, the guarantors, Anderson and Yancey, are liable to McIlroy Bank for the balance due on the note, which, as far as the Court is able to determine, is $93,245.20.

7. The Court now turns to the allegation, raised in the Trustee's complaint in AP 82–882, that the defendants abused the corporate entity of Ozark Restaurant Equipment Co., Inc. to such an extent that they should be held personally liable for the debts of the debtor herein. The Court finds that the debtor, Ozark Restaurant Equipment Co., Inc., was so controlled and manipulated by and for the benefit of Bruce Anderson and his various subsidiaries, that the named defendants herein, Bruce Anderson, Elmer Dale Yancey, Kenneth Eads, and Robert Whiteley, should be liable, jointly and severally in the sum of $126,908.18. The Court so finds for the following reasons:

A. An obvious inadequacy of capital, "measured by the nature and magnitude of the corporate undertaking," is an important factor to be considered in deciding whether to deny stockholders their defense of limited liability. *Anderson v. Abbott*, 321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793 (1944). Here, the $1,000 investment by Yancey and Anderson weighed against liabilities (initially) of $109,000 resulted in the debtor's being insolvent from its inception. Where capitalization has been inadequate, courts have been inclined to hold owners of the corporation personally liable. *Everett v. Trans-World Airlines*, 298 F.Supp. 1099

(1969). See also *Minton v. Cavaney*, 56 Cal.2d 576, 15 Cal.Rptr. 641, 364 P.2d 473 (1961); *Markow v. Alcock*, 356 F.2d 194 (5th Cir.1966); *Francis O. Day Co. v. Sharpiro*, 105 U.S. App. D.C. 392, 267 F.2d 669 (1959); *Stone v. Eacho*, 127 F.2d 284 (4th Cir.1942); *Henderson v. Rounds and Porter Lumber Co.*, 99 F.Supp. 376 (1951).

B. The directors and shareholders of Anderson-related entities, Bruce Anderson, and Elmer Dale Yancey, are also the sole shareholders of the debtor. As such, they were under a fiduciary obligation to protect the entire community of interests in the debtor corporation—creditors as well as stockholders. *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). *Francis v. United Jersey Bank*, 87 N.J. 15, 432 A.2d 814 (1981). It has long been the law in Arkansas that any failure of a director to exercise diligence or good faith which results in loss to a stockholder or creditor, entitles such stockholder or creditor to require the directors whose negligence have caused the loss to pay. In other words, the director whose negligence causes loss is liable for such loss to stockholders and creditors. *Smith v. Citation Mfg. Co.*, 266 Ark. 591, 587 S.W.2d 39 (1979); *Sternberg v. Blaine*, 179 Ark. 448, 17 S.W.2d 286, 288 (1929); *Bank of Commerce v. Goolsby*, 129 Ark. 416, 196 S.W. 803 (1917). There is an even greater fiduciary duty on one who is both a director and an officer in a company. *Raines v. Toney*, 228 Ark. 1170, 313 S.W.2d 802 (1958).

C. The upshot of the conclusions stated above, i.e., that the debtor was, from the beginning, grossly undercapitalized and that Anderson and Yancey owed a fiduciary duty to creditors of the debtor, is that the debtor, Ozark Restaurant and Equipment Co. Inc., became the mere instrumentality of Port City Equipment, and thus, other Anderson-controlled entities. *Steven v. Roscoe Turner Aeronautical Corporation*, 324 F.2d 157 (7th Cir.1963). The Bankruptcy Court, being a court of equity, looks beyond the mere outward shell to the parties in interest beyond the fictions of law and corporate forms to the purposes

and officers who are identified with that purpose. *McCaskill Co. v. U.S.*, 216 U.S. 504, 30 S.Ct. 386, 54 L.Ed. 590 (1910). Here, Anderson-related entities profited from the debtor while the debtor continually operated at increasing deficits. This course of conduct was exhibited by the sales from the debtor to Port City Equipment at low markups or no markups at all; by the credit arrangement with the debtor enjoyed by Anderson-related entities, i.e., they paid no interest on their accounts payable; by severely inadequate capitalization; and by preferential payments to McIlroy Bank. The disregard for the corporate entity of the debtor is illustrated by its failure to keep adequate books and records; the distribution of false financial statements; total failure to pay franchise, withholding and income taxes, and the failure to hold regular meetings of the shareholders and directors.

■ Certainly, the common owners of Port City and the debtor are not liable for the debts of the latter merely because of the common ownership. It is only when the privilege of transacting business in corporate form has been illegally abused to the injury of a third person that the corporate entities should be disregarded. *Rounds & Porter Lumber Co. v. Burns*, 216 Ark. 288, 225 S.W.2d 1 (1949). *Rounds & Porter Lumber Co., supra,* embodies the law in Arkansas regarding abuse of the corporate entity. The facts in that case are similar to the facts herein. In *Rounds, supra,* the Court allowed a creditor a judgment directly against the parent corporation for wrongful manipulation of the subsidiary to the parent's advantage at the expense of that creditor. Specifically, the court there found that products of the subsidiary were sold to the parent at a substantially lower price than that charged in sales to third persons. As here, the general manager of the subsidiary in *Rounds, supra,* protested that a profit could not be generated with such discounts for the parent corporation. The Court finds, as did the court in *Rounds, supra,* that "One of the surest indications of abuse ... is the fact that the executives of the subsidiary,

instead of acting independently in its interest, take their orders from the parent corporation in the latter's interest." 225 S.W.2d at 3.

In sum, in AP 82–883, the Court awards judgment to the Trustee against Anderson Cajun's Wharf, Inc. in the amount of $20,-208.39. In AP 82–884 the Court finds for the Trustee in the amount of $24,035.82. These preferential payments were paid to McIlroy Bank on a loan guaranteed by Yancey and Anderson. Ultimately, the liability in AP 82–884 rests upon Elmer Dale Yancey and Bruce Anderson. Also, in AP 82–884, McIlroy Bank has cross-claimed for the balance due on their original promissory note. The Court will also enter judgment against the guarantors, Anderson and Yancey, for the amount, which is $93,-245.20. Finally, in AP 82–882, the Court enters judgment for the Trustee in the amount of $136,653.38, or the amount of unsecured debt listed in the petition, against Bruce Anderson, Elmer Dale Yancey, Kenneth Eads, and Robert Whiteley.

SO ORDERED.