**AT & T GLOBAL INFORMATION SOLUTIONS COMPANY, et al., Plaintiffs,**

v.

**UNION TANK CAR COMPANY, et al., Defendants.**

No. C2–94–876.

United States District Court, S.D. Ohio, Eastern Division.

Nov. 2, 1998.

859

John T. Sunderland, Thompson Hine & Flory, Columbus, Ohio, for plaintiffs; Ben L. Pfefferle, III, Lisa A. Lomax, of counsel.

Craig H. Zimmerman, McDermott, Will & Emery, Chicago, Illinois, Paul J. Hause, Arter & Hadden, Columbus, Ohio, for defendant, Vermont American Co.

## MEMORANDUM AND ORDER

HOLSCHUH, District Judge.

This case is before the Court on cross motions for summary judgment. Plaintiffs, AT & T Global Information Solutions Company, AT & T, Goodyear Tire, and Steel Ceilings, Inc., filed a motion for partial summary judgment against defendant, Vermont American Corporation ("Vermont American") on the issue of liability. (Record at 263.) Vermont American responded to plaintiffs' motion. (Record at 291.) Plaintiffs replied to Vermont American's response. (Record at 297.) Similarly, Vermont American filed a motion for summary judgment against plaintiffs. (Record at 270.) Plaintiffs responded to Vermont American's motion (Record at 292), and Vermont American replied to plaintiffs' response. (Record at 304.) Having been fully briefed, these motions are ripe for decision; because they address the same issues, the motions will be decided together.

### BACKGROUND

This action arose out of the clean-up of chemical solvent waste on real property owned by defendant, Granville Solvents, Inc. ("GSI"), and located on Palmer Lane in Granville, Ohio. GSI operated as a petroleum-based bulk product storage, distribution, and recycling facility from 1958 until 1980. In 1980, GSI became a waste solvent reclamation site. In this capacity, GSI stored chemical solvent waste in underground tanks and drums. In 1986, the Ohio Environmental Protection Agency ("Ohio EPA") obtained an order from the Licking County Common Pleas Court requiring GSI to cease its operations as a waste solvent reclamation site. On June 18, 1990, the Ohio EPA undertook to remove tanks and drums of chemical solvent waste at the GSI site. The removal was completed on October 11, 1991. It is alleged that some of the drums and tanks removed by the Ohio EPA were in a rusted and deteriorated condition, which had allowed the waste to leak into the surrounding soil and groundwater.

Located adjacent to GSI is the Village of Granville's drinking water treatment plant ("plant"). In late 1993, the Ohio EPA discov-

ered that groundwater, which was allegedly contaminated from the leaking waste at GSI, was being drawn into the drinking water supply. Having been advised of the Ohio EPA's discovery, the U.S. Environmental Protection Agency ("EPA") acquired GSI's business records in an effort to determine who had arranged for treatment or disposal of waste at GSI. From the records, the EPA was able to generate a list of potentially responsible parties ("PRPs"). The EPA then notified the parties of their PRP status and demanded that, each PRP disclose the extent of their involvement with GSI. Plaintiffs were among those determined to be PRPs.

On September 7, 1994, plaintiffs entered into an Administrative Order of Consent ("Consent Order") with the EPA as contemplated by the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq., as amended* ("CERCLA.")[1]. The Consent Order required plaintiffs to engage in certain response actions at the GSI site. However, several PRPs did not join in the Consent Order. Therefore, on or about September 9, 1994, plaintiffs filed their original complaint under CERCLA. Through this action, plaintiffs sought to impose joint and several liability on those PRPs who refused to join in the Consent Order so as to recover all response costs plaintiffs incurred, and will incur, as a result of actual or threatened release of hazardous substances at the GSI site.[2] However, a March 18, 1996 Order of this Court, limited plaintiffs' potential recovery to contribution under CERCLA § 9613(f). (Record at 192.)

On September 15, 1995, plaintiffs filed an amended complaint naming Vermont American as a defendant in the action along with Vermont American's subsidiary, Larsan Manufacturing Company ("Larsan").[3] Plaintiffs amended the complaint on the belief that Larsan allegedly sent waste to GSI, and therefore, Larsan was a PRP who did not join in the Consent Order. Plaintiffs also named Vermont American as a defendant in order to seek contribution from it, as a parent corporation, for Larsan's share of the costs to clean up GSI.

## STANDARD OF REVIEW

Fed.R.Civ.P. 56(c) provides:

[Summary judgment] ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

"[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original); *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984).

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner,* 570 F.2d 107, 111 (6th Cir.1978). Therefore, summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is ... [and where] no genuine issue remains for trial, ... [for] the purpose of the rule is not

---

**1.** All parties to the Consent Order have formed the Granville Solvents PRP Group ("Group"). Members of the Group who are not named in the instant action have assigned their claims against defendants to plaintiffs. In turn, plaintiffs have assigned any recovery in the instant action to the Group in order to finance clean-up of the site at issue.

**2.** The complaint also seeks a declaration of rights as to defendants' liability for future response

costs in addition to recovery of interest, costs, and attorneys' fees incurred in connection with this litigation.

**3.** Until July 1991, Vermont American was the parent corporation of Larsan Manufacturing Company of Nevada ("Larsan of Nevada"). In turn, Larsan of Nevada was the parent corporation of Larsan. Both of these subsidiaries of Vermont American were dissolved in 1991.

to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)); *accord County of Oakland v. City of Berkley*, 742 F.2d 289, 297 (6th Cir.1984).

In making this inquiry, the standard to be applied by the Court mirrors the standard for what was formerly referred to as a directed verdict. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

> "The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted." *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745, n. 11, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

*Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505. Accordingly, although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

In a motion for summary judgment the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (footnote omitted); *accord Adams v. Union Carbide Corp.*, 737 F.2d 1453, 1455–56 (6th Cir.), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984). Inferences to be drawn from the underlying facts contained in such materials must also be considered in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Watkins v. Northwestern Ohio Tractor Pullers Ass'n*, 630 F.2d 1155, 1158 (6th Cir.1980). Additionally, "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. *Adickes*, 398 U.S. at 157–60, 90 S.Ct. 1598.

If the moving party meets its burden and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

### DISCUSSION

### I. Elements of CERCLA liability

■ In order to prevail in a private cost recovery or contribution [4] action brought under CERCLA:

> a plaintiff must establish that (1) the site on which the hazardous substances are contained is a "facility" under CERCLA's definition of that term, Section 101(9), 42

---

4. For purposes of determining liability, the same elements of proof apply to CERCLA claims brought pursuant to § 9607 (cost recovery) and § 9613 (contribution). *Bancamerica Commercial Corp. v. Trinity Indus. Inc.*, 900 F.Supp. 1427, 1450 (D.Kan.1995).

U.S.C. § 9601(9); (2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred, 42 U.S.C. § 9607(a)(4); (3) such "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan," 42 U.S.C. § 9607(a)(4) and (a)(4)(B); and (4) the defendant is within one of four classes of persons subject to the liability provisions of Section 107(a).

*Pierson Sand & Gravel Inc. v. Pierson Township,* 89 F.3d 835 (Table), 1996 WL 338624, *1 (6th Cir.1996), citing, *3550 Stevens Creek Assoc. v. Barclays Bank of California,* 915 F.2d 1355, 1358 (9th Cir.1990) (citation and footnote omitted), *cert. denied,* 500 U.S. 917, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991). Regarding the first and second CERCLA elements, there is no dispute; Vermont American admits that the GSI site is a "facility" as defined in § 9601(9) and that there has been a "release" or "threatened release" of one or more hazardous substances at the GSI site as defined and used in § 9607(a) and § 9601(22). (Vermont American's Answer to First Amended Complaint, ¶ 45 & ¶ 47).

█ The third element, by its plain language, requires that the response costs incurred by plaintiff be both "necessary" and "consistent with the national contingency plan." Vermont American asserts that plaintiffs' motion for partial summary judgment must fail because they have not shown that the response costs incurred are "necessary." While it is true that proof of the third element is required to *prevail* on a CERCLA claim, any failure by plaintiffs to show the "necessity" of response costs at this stage is not fatal. When, through partial summary judgment, a plaintiff seeks a declaration of the defendant's liability, the plaintiff is not required to prove that the response costs are necessary and consistent with the national contingency plan; issues of proof related to the necessity and consistency of response costs are properly addressed in the contribution or damages phase of trial. *Stychno v. Ohio Edison Co.,* 806 F.Supp. 676, 680 (N.D.Ohio 1992), citing, *Southland Corp. v. Ashland Oil Inc.,* 696 F.Supp. 994, 999 (D.N.J.1988); *T & E Indus., Inc. v. Safety Light Corp.,* 680 F.Supp. 696, 708 (D.N.J.

1988); *County Line Investment Co. v. Tinney,* 933 F.2d 1508, 1513 (10th Cir.1991).

The real point of contention in both plaintiffs' motion for partial summary judgment and Vermont American's motion for summary judgment involves the fourth element of the above enumerated test: whether Vermont American is within one of four classes of persons subject to the liability provisions of CERCLA. CERCLA § 9613 provides contribution may be sought from any person who is liable or potentially liable under § 9607. § 9607 lists four groups of potentially responsible parties (PRPs):

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person,

. . .

42 U.S.C. § 9607(a)(1)–(4). It is clear that plaintiffs seek contribution from Vermont American for actions as an "arranger", as described in (3) above. (Plaintiffs' First Amended Complaint, ¶ 46.) Furthermore, Vermont American is named as a defendant in its capacity as "the parent corporation, or successor in interest to, Defendant Larsan Manufacturing Co." (Plaintiffs' First Amended Complaint, ¶ 12.) Thus, in proceeding against Vermont American as an arranger and parent corporation, plaintiffs are proceeding under a theory of derivative liability.

## II. Derivative/Arranger Liability

To attach derivative liability for Larsan's actions as an arranger under CERCLA the plaintiffs must pierce Vermont American's corporate veil. A precursor to the proper

analysis of this issue involves first determining if Larsan would have been liable as an arranger had it not been dissolved.[5] If so, the remaining question becomes whether a parent corporation, Vermont American, can be held derivatively liable under CERCLA when its subsidiary, Larsan, acts as an arranger.

### A. Larsan's Liability as an Arranger

■ Arranger liability is imposed on "any person who by contract, agreement, or otherwise, arranged for disposal or treatment . . . of hazardous substances owned or possessed by such person." 42 U.S.C. § 9607(a)(3). However, CERCLA does not define the phrase 'arranged for' in the arranger liability provision for parties who otherwise arranged for disposal of hazardous substances. *U.S. v. Cello–Foil Prod., Inc.,* 100 F.3d 1227 (6th Cir.1996). Thus, federal case law must be reviewed to define arranger.

In *U.S. v. Cello–Foil,* the Sixth Circuit determined that "[i]f an arrangement has been made, that party is liable for damages caused by the disposal. . . . Moreover, a party can be responsible for 'arranging for' disposal, even when it has no control over the process leading to the release of substances." *U.S. v. Cello–Foil Prod., Inc.,* 100 F.3d 1227, 1232 (6th Cir.1996) (quoting *Cadillac Fairview/Cal., Inc. v. U.S.,* 41 F.3d 562, 565 (9th Cir.1994)).

The evidence in the instant case shows that Larsan created the wastes and arranged for disposal of the waste at the GSI site. *See,* Letter from James Allen to, Larsan Manufacturing, dated January 15, 1990, Appendix 45; Affidavit of John Reeb and Waste Manifests for the GSI Site, attached to Plaintiffs' Motion for Partial Summary Judgment as to Liability Against Defendant Vermont American, Appendix 28, Exhibit 8 (hereafter Plaintiffs' Motion). The waste Larsan deposited at GSI was of the same chemical makeup

of that which the CERCLA cleanup action is now addressing. *See In the Matter of Granville Solvents Site,* (U.S.EPA, Sept. 7, 1994) (administrative order by consent, # VW94C248), Attachment C, D. Based on these facts, the evidence accompanying Plaintiffs' Motion clearly indicates that Larsan arranged for the disposal of various toxins at the GSI site, and that Larsan was an arranger pursuant to 42 U.S.C. § 9607(a)(3).

### B. Vermont American's Derivative Liability

■ In *U.S. v. Bestfoods,* 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), the U.S. Supreme Court held that only when the corporate veil is pierced may a parent corporation be charged with derivative CERCLA liability for its subsidiary's actions. The Court was analyzing when a parent corporation may be held derivatively liable for the subsidiary's acts as an *operator. Id.,* 118 S.Ct. at 1886 & n. 10. The Court based its ruling on the following premise: If a subsidiary that operates, but does not own, a facility which is so pervasively controlled by its parent so as to warrant veil piercing, the parent is derivatively liable. *Id.*

The parties to this action have cited no case law on the question of a parent corporation's derivative liability for the CERCLA violations of its subsidiary acting as an *arranger,* and this Court is unaware of any case law on point. It is implicit, however, in both *Bestfoods* and *U.S. v. Northeastern Pharm. & Chem. Co., Inc.,* 810 F.2d 726, 744 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987), that a parent can be held derivatively liable as an arranger if the corporate veil can be pierced. Moreover, it is within the intent of CERCLA to impute derivative arranger liability upon a parent corporation if their corporate veil can be pierced and if their subsidiary can be adjudged an arranger.[6] *See generally An-*

---

5. Pursuant to this Court's Memorandum and Order filed July 6, 1998, Larsan has been dismissed from this lawsuit because it is both "dead and buried." *See, Stychno v. Ohio Edison Co.,* 806 F.Supp. 663 (N.D.Ohio 1992). However, for purposes of veil piercing, Larsan will be treated as an entity through which Vermont American may be held liable.

6. Case law does exist which clearly distinguishes between the tests used to, impute either arranger

or operator liability. *See, e.g., U.S. v. TIC Inv. Corp.,* 68 F.3d 1082, 1091–1092 (8th Cir.1995), *cert. denied,* 519 U.S. 808, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996). However these cases are distinguishable because they deal with *direct* liability not *derivative* liability as does the case at bar. *See also Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund,* 25 F.3d 417 (7th Cir.1994) (noting that direct, personal liability provided by CERCLA is distinct from the derivative liability that results from piercing the corporate veil).

*spec Co. v. Johnson Controls, Inc.*, 922 F.2d 1240, (6th Cir.1991) (ruling that Congress included successor corporations within the description of entities that are potentially liable under CERCLA for cleanup costs). This premise is further bolstered by those courts which have ruled that derivative liability does not require actual participation in the wrongful conduct. *U.S. v. Wallace*, 961 F.Supp. 969 (N.D.Tex.1996) (citing *Joslyn Mfg. Co. v. T.L. James & Co.*, 893 F.2d 80 (5th Cir.1990), *cert. denied*, 498 U.S. 1108, 111 S.Ct. 1017, 112 L.Ed.2d 1098 (1991)).

Construing the aforementioned opinions, this Court holds that if a subsidiary who arranges for the disposal of its waste is so pervasively controlled by its parent to warrant veil piercing, the parent may be held derivatively liable for its subsidiary's CERCLA violations. If plaintiffs' evidence is sufficient to pierce Vermont American's corporate veil, Vermont American will be liable for Larsan's CERCLA violations. However, as an initial matter, this Court must first decide to what degree Larsan of Nevada's existence will inhibit piercing Vermont American's corporate veil.

*C. Piercing the Veil of a "Grandparent" Corporation*

■ Vermont American purchased Larsan in the 1960s. Larsan of Nevada was incorporated by Vermont American in the 1980s. Thereafter, Vermont American transferred ownership of Larsan to Larsan of Nevada. Thus, for all intents and purposes, while these corporations were in existence, Vermont American was Larsan's "grandparent." This Court finds that under the present circumstances the corporate veil of a grandparent corporation should be pierced in the same manner as that of the parent.

■ In this instance, Larsan's immediate parent corporation, Larsan of Nevada, was merely a legal fiction. Ohio law[7] indicates that the corporate form of the subsidiary will be disregarded when it is so dominated and controlled that it has no more than a paper existence. *State ex rel. Johnson & Higgins Co. v. Safford*, 117 Ohio St. 576, 159 N.E. 829 (1927) (followed in *Independent Ins. Agents of Ohio v. Fabe*, 63 Ohio St.3d 310, 315, 587 N.E.2d 814, 819 (1992)). Larsan of Nevada had no more than a paper existence, thus, it is unnecessary to go through the steps of piercing the veil of Larsan's immediate parent, Larsan of Nevada.[8]

Protecting the shareholders or parents of a limited liability company is an important pretext to Ohio corporation law. *Univ. Circle Research Ctr. Corp. v. Galbreath Co.*, 106 Ohio App.3d 835, 667 N.E.2d 445 (1995), *appeal not allowed*, 75 Ohio St.3d 1451, 663 N.E.2d 332 (1996) (construing Article XIII, § 3 of the Ohio Constitution). Nevertheless, it is sufficient to require the piercing of Vermont American's corporate veil to protect the interests of the limited liability corporate form. *See generally Dirksing v. Blue Chip Architectural Prod., Inc.*, 100 Ohio App.3d 213, 653 N.E.2d 718 (1994) (when the corporate form is used to subvert intent and policy of this fiction, it will be disregarded). More-

---

7. As will be discussed more thoroughly in this decision, this Court must look to Ohio corporation law to determine Vermont American's potential liabilities.

8. Vermont American argues that its grandparent status cannot be pierced since the initial subsidiary has been dissolved. They quote *Central States S.E. & S.W. Areas Pension Fund v. Minneapolis Van & Warehouse Co.*, 764 F.Supp. 1289 (N.D.Ill.1991), for the proposition that "[c]orporate veil-piercing is no longer an issue once a company has dissolved, for there is no longer a veil to be pierced." However, *Central States* further espoused that "[w]hen the assets of a corporation are distributed to its shareholders leaving corporate debts unpaid, liability of the shareholders to a creditor, to the extent of the value of the assets received, is beyond question." *Id.* at 1294. And, that "[a]ny such distribution of assets is deemed a fraud on creditors." *Id.*

Larsan's waste was taken to the GSI site. Pursuant to CERCLA, the cleanup of the GSI site indebted Larsan to "creditors" such as the plaintiffs. *See generally* 42 U.S.C. 9613(f). Thus, Vermont American, due to the debts of its dissolved subsidiary Larsan, cannot avoid veil piercing simply because Larsan does not "exist." Permitting this argument to succeed would be against the manifest intent of CERCLA. *See also Traverse Bay Area Intermediate School Dist. v. Hitco, Inc.*, 762 F.Supp. 1298, 1301 (W.D.Mich.1991) (finding that, per Congressional intent, CERCLA actions against dissolved corporations must be permitted to proceed).

over, when attempting to find the entity who is ultimately responsible for a CERCLA violation, it would be violative of Congressional intent to have to pierce the veil of each and every fictional corporation between a subsidiary and its ultimate controlling parent.

Thus, having found that a parent can be held derivatively liable for the acts of its subsidiary as an arranger and that Vermont American is the parent of Larsan for veil piercing purposes, this Court must first determine whether to apply federal common law or state law corporation principles for veil piercing. Second, through the application of this law, the Court must determine whether the evidence supports piercing Vermont American's corporate veil.

### III. Applicable law

When reconciling corporation law with principals of CERCLA liability, courts have struggled with which law to apply—federal common law or the law of the forum state.[9] The 6th Circuit has determined that trial courts must look to state corporation law when attempting to pierce the corporate veil in CERCLA cases. *See Donahey v. Bogle,* 129 F.3d 838, 843 (6th Cir.1997), *vacated on other grounds,* —— U.S. ——, 118 S.Ct. 2317, 141 L.Ed.2d 692 (1998). *See also Plaskon Elec. Materials, Inc. v. Allied–Signal, Inc.,* 904 F.Supp. 644, 655 (N.D.Ohio 1995); *Anspec Co. v. Johnson Controls, Inc.,* 922 F.2d 1240 (6th Cir.1991). While it is plain from the relevant case law that this Court must apply state corporate law principals, because the Vermont American and Larsan were incorporated in different states, the question resolves to determining which state's law to apply.

### A. Applying Ohio Law

 Larsan was incorporated in Ohio. Larsan of Nevada was incorporated in Nevada. Vermont American was incorporated in Delaware. Both plaintiffs and Vermont American essentially admit that Ohio law provides the relevant standard for piercing the corporate veil. *See* Vermont American's Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment (hereafter Ver-

mont Americans Memo in Opposition), pp. 11–12; Plaintiffs' Motion, pp. 7–8. However, Vermont American asserts that the laws of Nevada and Delaware should also be reconciled to pierce Larsan of Nevada's corporate veil, even though Nevada, Delaware, and Ohio veil piercing laws are substantially similar. *See* Vermont American's Memo in Opposition, p. 12. Given that the facts indicate that Larsan of Nevada was created only to own Larsan and had no other assets, (*See* Deposition of Robert Faust, p. 22 and discussion in Part II, C., *supra*) the Court finds that the corporation law of Nevada has no application in this case.

Although Vermont American's argument that the law of Delaware should be applied is colorable given that Delaware is its state of incorporation, the court in *Hoover v. Recreation Equip. Corp.,* 792 F.Supp. 1484, 1491 (N.D.Ohio 1991) held that Ohio choice of law principles for tort actions called for the law of the state with the most significant relationship to the lawsuit. Considering factors laid out in § 175 of Rest. of Conflicts (Second), the *Hoover* court ruled that the state where injury occurred had a more significant relationship than the state of incorporation. *Id.;* accord, *Litarowich v. Wiederkehr,* 170 N.J.Super. 144, 150–151, 405 A.2d 874 (1979). The logic behind these decisions is that a state's interest in applying its law to citizens injured by foreign corporations outweighs the interest of the incorporating state. Larsan was incorporated in Ohio for more than twenty years and had employed Ohio citizens. Thus, Ohio and its citizens have a substantial interest in having their laws applied.

Furthermore, these CERCLA violations were committed in Ohio. The GSI site is located in Ohio. The Ohio and U.S. EPA are involved in the cleanup. Virtually all parties to the instant action have either done business in Ohio or were incorporated in Ohio during the relevant period. *See* Plaintiffs' First Amended Complaint, pp. 2–7. Not only Larsan's waste, but virtually all the waste that was disposed of at the GSI site originat-

---

**9.** The Supreme Court in *Bestfoods, supra* addressed this issue but did not decide it. *Best-*

*foods,* 118 S.Ct. 1876, 1885 & n. 9.

ed in Ohio. *Id. See also,* Affidavit of John Reeb and Waste Manifests for the GSI Site, Plaintiffs' Motion, Appendix 28, Exhibit 8. Since the contamination which caused this action took place in Ohio, the cleanup of it must take place in Ohio. Other federal district courts have held that states have a special interest in exercising judicial jurisdiction over those who contaminate their native soils in violation of CERCLA. *Mesiti v. Microdot, Inc.,* 739 F.Supp. 57, 61 (D.N.H.1990). Additionally, although the locus of an action in and of itself is certainly not dispositive, it is another factor courts consider when determining which state's choice of law to apply. *See Boyle v. Jacor Communications, Inc.,* 799 F.Supp. 811, 813 (S.D.Ohio 1992) (holding that in deciding which state's law applies, federal courts apply the forum state's choice of law rules). *See also Stromberg Metal Works v. Press Mechanical, Inc.,* 77 F.3d 928 (7th Cir.1996) (citing *Klaxon Co. v. Stentor Elec. Mfg.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (ruling that because the district court was in Illinois, that state's choice of law rules apply)).

Finally, according to the motions and evidence presented, both parties agree that Delaware's corporate veil piercing law is similar to Ohio's. *See* Vermont American's Memo in Opposition, pp. 11–12; Plaintiffs' Motion, pp. 7–8. It has been held that, when the choice of law between states does not substantially differ, trial courts will defer to the state whose interests would be most promoted by following their respective laws. *See generally Chrysler Corp. v. Ford,* 972 F.Supp. 1097, 1102–1104 (E.D.Mich.1997). Since no tangible interest of Delaware would be promoted by using Delaware law; Ohio law will be applied in analyzing plaintiffs' attempt to pierce Vermont American's corporate veil and attach CERCLA liability.

### IV. Piercing the Corporate Veil in Ohio

The test for piercing the corporate veil in Ohio was set out by its Supreme Court in *Belvedere Condominium Unit Owners' Ass'n v. R.E. Roark Cos., Inc.,* 67 Ohio St.3d 274, 617 N.E.2d 1075 (1993). The *Belvedere* court listed the following as prerequisites to disregarding the corporate form:

1. Control over the corporation by those to be held liable was so complete that the corporation had no separate mind, will, or existence, of its own;

2. Control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an Illegal act against the person seeking to disregard the corporate entity; and

3. Injury or unjust loss resulted to the plaintiff from such control and wrong.

*Id.* at 288, 617 N.E.2d 1075. *See also Bucyrus–Erie Co. v. Gen. Prod. Corp.,* 643 F.2d 413, 418 (6th Cir.1981). If these three requirements are met, the corporate veil will be pierced and the parent corporation will be held liable for the wrongs of its subsidiary; the parent is consequently determined to be the "alter-ego" of the subsidiary. *Belvedere,* 67 Ohio St.3d 274, 617 N.E.2d 1075; *Bucyrus–Erie Co.,* 643 F.2d 413, 418.

*A. Meeting the Requirements of Belvedere*

*1. Control over the corporation by those to be held liable was so complete that the corporation had no separate mind, will, or existence, of its own.*

■ The first prong enunciated in *Belvedere* requires plaintiffs to present sufficient evidence of Vermont Americans domination and control over Larsan to prove that Larsan had "no separate mind, will, or existence of its own." *See Belvedere,* at 288, 617 N.E.2d 1075, 1086.

Vermont American purchased Larsan in the 1960s. Vermont American sold Larsan to Larsan of Nevada, another wholly owned subsidiary, in the 1980s. Vermont American effectuated the dissolution of both Larsan and Larsan of Nevada in the 1990s. *See* Deposition of Robert Faust, pp. 21–26. These actions are certainly indicative of control.

The evidence accompanying Plaintiffs' Motion also reveals that Vermont American owned (effectively) all of the capital stock in its subsidiary Larsan. *See* Deposition of Robert Faust, pp. 21–26. Vermont American and Larsan had overlapping employees, corporate directors and officers. *See* Minutes of Meeting of Directors of Larsan and Larsan of Nevada, Plaintiffs' Motion, Appendix 42 & 43. Vermont American financed Larsan.

*See* Vermont American's Memo in Opposition pp. 6–7. Larsan had minimally adequate capital. *See* Deposition of Robert Faust, pp. 68–69. There was commingling of funds between Vermont American and Larsan. *See* Deposition of Mark Zehnder, pp. 85–92. Vermont American effectively paid the employee benefits and other miscellaneous expenses or losses of Larsan. *See generally* Minutes of Meetings for Larsan and Larsan of Nevada, Plaintiffs' Motion, Appendix 42 and 43. Vermont American's employee's effectuated the liquidation of the Larsan. *See* Plan of Partial Liquidation, Plaintiffs' Motion, Appendix 43, Exhibit A; Vermont American's Memo in Opposition pp. 8–9. Finally, Vermont American obtained all the funds from Larsan upon liquidation. *See* Plan of Partial Liquidation of Larsan Manufacturing Company of Ohio, Plaintiffs' Motion, Appendix 43, Exhibit A; *see also* Certificate of Dissolution of Shareholders Larsan Manufacturing, Plaintiffs' Motion, Appendix 39; Certificate of Dissolution of Shareholders Larsan of Nevada, Plaintiffs' Motion, Appendix 40.

■ The facts indicate that the directors and corporate officers, although they carried different titles, were the same between Larsan and Vermont American. *See generally* Minutes of Meeting of Directors of Larsan and Larsan of Nevada. However, this Court notes that for purposes of disregarding the corporate form, Ohio law permits one corporation to own all of the stock of another corporation as well as to employ common officers and directors, as well as other personnel, without risking veil piercing. *See, e.g., North v. Higbee Co.,* 131 Ohio St. 507, 3 N.E.2d 391 (1936); *Univ. Circle Research Ctr. Corp. v. Galbreath Co.,* 106 Ohio App.3d 835, 667 N.E.2d 445 (1995).

■ The evidence also establishes that Larsan had minimally adequate capital. *See* Deposition of Robert Faust, pp. 68–69. Vermont American contends that Larsan was sufficiently capitalized. However, for the purposes of piercing, inadequate capitalization is defined as capitalization that is very small in relation to the nature of the business of the corporation *and the risks* the business necessarily entails. *See, e.g.,* 18 Am.Jur.2d *Corporations,* § 50 (1988); *In re Ozark Restaurant Equip. Co.,* 41 B.R. 476 (Bankr.

W.D.Ark.1983) (emphasis added), *cert. denied,* 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987). Larsan had environmental risks which became obvious to Vermont American prior to dissolution. *See,* Letter from James Allen to Larsan Manufacturing, dated January 15, 1990, Appendix 45; Affidavit of John Reeb and Waste Manifests for the GSI Site, attached to Plaintiffs' Motion, Appendix 28, Exhibit 8. Leaving no fund in place to provide for potential liability is equivalent to undercapitalization. *See generally* 18 Am. Jur.2d *Corporations,* § 50 (1988); *In re Ozark Restaurant Equip. Co.,* 41 B.R. 476 (Bankr.W.D.Ark.1983) (emphasis added), *cert. denied,* 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987).

Given the foregoing, this Court finds that there is sufficient evidence to conclude that Vermont American had the requisite control to pass the first prong of *Belvedere.* Accord *Univ. Circle Research Ctr. Corp., supra; see also Clinical Components, Inc. v. Leffler Indus., Inc.,* Ohio App. No. 95CA0085, 1997 WL 28246, (9th Dist. Jan. 22, 1997), unreported. *See generally Damascus Mfg. Co. v. Union Trust Co.,* 119 Ohio St. 439, 164 N.E. 530 (1928) (followed in *St. Paul Fire & Marine Ins. Co. v. PepsiCo. Inc.,* 884 F.2d 688, 703 (2nd Cir.1989)).

*2. Control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity.*

■ When it developed its three prong test, the *Belvedere* court was construing *North v. Higbee Co.,* 131 Ohio St. 507, 3 N.E.2d 391 (1936). According to *Belvedere:*

*North* required a party seeking to pierce a corporate veil to prove two essential facts: (1) that the corporation was formed in order to perpetrate a fraud, and (2) that the shareholder's control of the corporation was exercised to defraud the party.

We believe that the first prong of the *North* test no longer reflects the realities of modern corporate life. The requirement that a corporation be formed in order to perpetrate a fraud is simply too strict. The ease with which close corporations and corporate subsidiaries can be created and

the ability to transfer ownership of an existing corporation lead us to believe that corporations formed for legitimate purposes can easily be later used to commit fraud or other wrongs. Moreover, it seems that in practice it would be unreasonably difficult to prove that any corporation was actually formed in order to perpetrate a fraud.

*Belvedere Condominium Unit Owner's Ass'n v. R.E. Roark Cos., Inc.,* 67 Ohio St.3d 274, 286–87, 617 N.E.2d 1075, 1085–86 (1993). Accordingly, it is now unnecessary to attempt to find fraud in Vermont American's formation as the parent of Larsan. Instead, Ohio courts construing *Belvedere* have held that *Belvedere* allows a corporate veil to be pierced when inequitable or unfair consequences had resulted. *See, e.g., Wiencek v. Atcole Co., Inc.,* 109 Ohio App.3d 240, 244, 671 N.E.2d 1339, 1342 (1996). In fact, even prior to *Belvedere,* Ohio courts had reached this same conclusion. *See, e.g., Newark Natural Gas & Fuel Co. v. Newark,* 22 Ohio N.P. (n.s.) 187 (1918); *E.S. Preston Assoc., Inc. v. Preston,* 24 Ohio St.3d 7, 492 N.E.2d 441 (1986); *see also LeRoux's Billyle Supper Club v. Ma,* 77 Ohio App.3d 417, 602 N.E.2d 685 (1991). As noted in *LeRoux's,* the Ohio Supreme Court endorses the notion that the corporate veil could be pierced if an injustice would result. *LeRoux's* at 422, 602 N.E.2d at 688–689. Several Ohio appellate courts have been even more expansive and chose to disregarded the corporate entity all together where evidence of harm, injustice, or fundamental unfairness has been found. *Id.; see generally Dirksing v. Blue Chip Architectural Prod., Inc.,* 100 Ohio App.3d 213, 653 N.E.2d 718 (1994); *Link v. Leadworks Corp.,* 79 Ohio App.3d 735, 607 N.E.2d 1140 (1992); *Saeks v. Saeks,* 24 Ohio App.3d 67, 70, 493 N.E.2d 280, 283 (1985); *Cent. Benefits Mut. Ins. Co. v. RIS Admrs. Agency, Inc.,* 93 Ohio App.3d 397, 638 N.E.2d 1049 (1994). *See also Bucyrus–Erie Co. v. Gen. Prod. Corp.,* 643 F.2d 413 (6th Cir.1981). Thus, the manifest view in Ohio is that if injustice can be shown, prong two of *Belvedere* will be satisfied.

■ Turning to the specific facts of this case, Vermont American was well aware of Larsan's manufacturing problems, as is evidenced by James F. Allen's January 15, 1990 letter to Vermont American. See, Appendix 45. Although Vermont American attempted to deny such knowledge in vague interrogatory responses, such denials do not suffice to outweigh depositions, affidavits, and other evidence which make clear that Vermont American knew of Larsan's disposal requirements and potential liabilities before liquidating Larsan's assets.

Timothy T. Shea, Vermont American's President and C.E.O., avers that the decision to dissolve Larsan and Larsan of Nevada was in no way based on environmental liability. *See* Affidavit of Timothy T. Shea, Vermont American's Memo in Opposition, Exhibit D. Mr. Shea also states that Larsan was not meeting reasonable business expectations in the late 1980s and that this is why Larsan and Larsan of Nevada were dissolved in mid 1991. *Id.* However, in contrast to Mr. Shea's assertions are pages and pages of Meeting Minutes from the directors of Larsan and Larsan of Nevada, which do not speak to the poor performance or impending liquidation of either Larsan or Larsan of Nevada. Typically, years of poor performance are reflected in the corporate officers' meeting minutes.

Such inconsistencies bolster this Court's belief that Vermont American responsibility for Larsan's CERCLA violation would result in unfair and inequitable consequences, which Ohio Courts are rue to permit.

Finally, Congress enacted CERCLA with the intent of ensuring "that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions." S.Rep. No. 848, 96th Cong., 2d Sess. 13 (1980). *See also B.F. Goodrich v. Murtha,* 958 F.2d 1192, 1198 (2nd Cir.1992) (holding that one of CERCLA's primary goals is to extend liability to all those involved in creating harmful environmental conditions). Courts applying state veil piercing law in conjunction with a CERCLA action must keep this statute's broad legislative purpose in mind. It would be unfair and incongruous with CERCLA to permit the entity which profited from improper waste disposal to escape all liability. Thus, with the intent behind CERCLA in mind and considering cases construing *Belvedere,* the record presents sufficient evidence to pass

the second, or fairness, prong of the *Belvedere* test for piercing the corporate veil.

### 3. *Injury or unjust loss resulted to the plaintiff from such control and wrong.*

In construing the last prong of *Belvedere*, the court in *Pritchett v. Pingue* found that:

> To the extent that such dominion exercised by [the defendant] was used in the present case to avoid paying for [corporate liabilities], a wrong has been committed and potential injury or unjust loss resulted to [the plaintiff] from such wrong, meeting the second and third prongs of the *Belvedere Condominium Ass'n* test.

*Pritchett v. Pingue*, Ohio App. No. 96APE11–1598, 1997 WL 578952, (10th Dist. Sept. 16, 1997). If it were still in existence, Larsan would have languishing corporate debts based on CERCLA liability. These debts would certainly have qualified under *Pritchett*.

Vermont American controlled Larsan, and Larsan disposed of its wastes in a manner that violated CERCLA. But for its dissolution, Larsan would be liable to plaintiffs through a CERCLA contribution action. It would be unjust to allow Vermont American to escape liability simply because it dissolved its patently culpable subsidiary—especially after receiving notice of potential environmental liability. *See,* Letter from James Allen to Larsan Manufacturing, dated January 15, 1990, Appendix 45. It would be equally unjust to make plaintiffs shoulder the entire burden of this cleanup when potentially responsible parties are readily discernable. The costs of Larsan's actions should rightly be born by the parent who controlled it, not plaintiffs. Thus, this Court finds sufficient evidence to determine that plaintiffs have met the third prong of *Belvedere*.

Given that the three *Belvedere* requirements are met, Vermont American's corporate veil will be pierced to make certain that the entity who ultimately profited from arranging for the improper disposal of hazardous waste bears some of the burden for its cleanup. Any other decision would be circumventing the broad, expansive, and remedial purposes of CERCLA.

Vermont American is derivatively liable for the actions of its subsidiary Larsan in arranging for the disposal of its toxic waste at the GSI site. It is not dispositive that Vermont American did not create the waste; derivative arranger liability under CERCLA does not require actual participation in wrongful conduct. *U.S. v. Wallace,* 961 F.Supp. 969 (N.D.Tex.1996) (citing *Joslyn Mfg. Co. v. T.L. James & Co.,* 893 F.2d 80 (5th Cir.1990), *cert. denied,* 498 U.S. 1108, 111 S.Ct. 1017, 112 L.Ed.2d 1098 (1991)). It is not dispositive that Vermont American did not micro-manage Larsan; sufficient control and unfairness has been demonstrated to satisfy *Belvedere*. What is dispositive is that Vermont American owned all the relevant assets of Larsan from whom they profited for many years, and that Larsan disposed of its hazardous waste at the GSI site; a site that is currently undergoing a CERCLA cleanup action. Consequently, for the foregoing reasons, Vermont American is liable to plaintiffs for its share of the cleanup of the GSI site as a matter of law.

### CONCLUSION

Accordingly, plaintiffs' motion for partial summary judgment is **GRANTED.** Vermont American's motion for summary judgment is **DENIED.**

**IT IS SO ORDERED.**