**UNITED STATES of America,**
**Plaintiff(s),**

v.

**CHRYSLER CORPORATION,**
**et al., Defendant(s).**

**No. 597CV894.**

United States District Court,
N.D. Ohio,
Eastern Division.

Sept. 4, 2001.

Arthur I. Harris, Office of the United States Attorney, Northern District of Ohio, Cleveland, OH, Daniel C. Beckhard, U.S. Department of Justice, Environmental Enforcement Section, Lois J. Schiffer, Department of Justice, Environment & Natural Resources Division, Environmental Defense Section, Washington, DC, Shawn P. Mulligan, Boulder, CO, Stacey H. O'Bryan, U.S. Department of Justice, Environmental Enforcement Section, Washington, DC, for United States Of America, Plaintiffs.

Steven C. Kohl, Howard & Howard, Bloomfield Hills, MI, for Chrysler Corporation.

James G. O'Connor, Dickinson, Wright, Grand Rapids, MI, Margaret A. Coughlin, Rebecca L. Takacs, Dickinson, Wright, Moon, Van Dusen, Detroit, MI, for Ford Motor Company.

Daniel E. Vineyard, Richard T. Hughes, Chevron Corporation, Department of Law, Houston, TX, for Kewanee Industries, Inc., Chevron U.S.A., Inc.

Benjamin E. Wolff, III, Eric A. Oesterle, Sonnenschein Nath & Rosenthal, Chicago, IL, James L. Moeller, Sonnenschein, Nath & Rosenthal, Kansas City, MO, Jeffrey C. Fort, Michael M. O'Hear, Natalie J. Spears, Sonnenschein, Nath & Rosenthal, Chicago, IL, Ray L. Weber, Renner, Kenner, Greive, Bobak & Taylor, Akron, OH, Susan M. Franzetti, Sonnenschein, Nath & Rosenthal, Chicago, IL, for Minnesota Mining and Manufacturing Company.

Brian T. Vandervest, Katherine A. Moertl, Matthew J. Duchemin, Quarles & Brady, Milwaukee, WI, for Waste Management.

John A. Heer, Ralph E. Cascarilla, Walter & Haverfield, Cleveland, OH, for Federal Metal Company.

## MEMORANDUM OPINION

DOWD, District Judge.

This matter is before the Court on Defendant Minnesota Mining and Manufacturing Company's motion for partial summary judgment ("3M," Doc. No. 139) and Plaintiff United States' motion for partial summary judgment as to liability ("U.S.," Doc. No. 145).[1] Responses and replies have been filed with regard to both motions.[2]

For the reasons that follow, Defendant 3M's motion for partial summary judgment is denied with respect to the argument that the U.S., an owner and operator of the Site, is limited to an action for contribution under CERCLA § 113(f) to recover its response costs,[3] and Plaintiff U.S.'s mo-

---

1. Defendant 3M's motions and briefs refer to the federal agencies individually. This opinion, however, will refer to the plaintiff as the U.S. In an attempt to provide clarity, the Court will attribute the response activities to the particular agency that conducted them (*i.e.*, the National Park Service or the Environmental Protection Agency). However, the Court places no importance on this distinction with respect to the merits of any of the motions pending regarding liability or response costs.

2. The following pleadings are cited in this opinion and will be cited by document number only (*e.g.*, Doc. No. X): Defendant 3M's motion for partial summary judgment (Doc. No. 139) with memorandum in support (Doc. No. 140); Plaintiff's motion for partial summary judgment as to response costs (Doc. No. 142) with memorandum in support (Doc. No. 143); Plaintiff's motion for partial summary judgment as to liability (Doc. No. 145) with memorandum in support (Doc. No. 146); Defendant 3M's memorandum of law in opposition to Plaintiff's motion for partial summary judgment as to liability (Doc. No. 160); Defendant 3M's response to Plaintiff's statement of undisputed facts in support of Plaintiff's motion for partial summary judgment as to liability (Doc. No. 161); and Defendant 3M's reply to Plaintiff's opposition to Defendant's statement of uncontroverted material facts (Doc. No. 172).

3. Although Defendant 3M raises an issue regarding response costs, the Court has elected

tion for partial summary judgment as to liability is granted.

## I. Background

In 1974, Congress created the Cuyahoga Valley National Recreation Area, which has recently been redesignated by Congress as a National Park. *See* 16 U.S.C. § 460ff.[4] In addition, Congress authorized the Department of Interior ("DOI") to acquire properties located within the boundaries of the recreation area and directed that the land acquisition program be substantially completed within six years after December 27, 1974. *See* 16 U.S.C. §§ 460ff-1, -2(b).[5] Pursuant to this Congressional mandate, the U.S. sought to acquire two parcels of land located along Hines Hill Road in Summit County, Ohio, referred to as the East and West Tracts, and known as the Krejci Dump Site (the "Site").

The Site was operated as a dump and salvage yard beginning sometime in the 1940s by John Krejci II ("Krejci II").[6] In 1971, John Krejci III ("Krejci III") inherited the property upon his father's death and continued to operate a salvage yard on the property. In 1979, the U.S. sought to acquire the property by condemnation, through exercise of the power of eminent domain. A trial was conducted in early 1980 to determine the value of the West Tract, and Krejci III was awarded $516,000. The parties then agreed to a purchase price of $850,000 for the East Tract. The parties entered into a consent judgment resolving the condemnation proceeding, which granted Krejci III the right to retain special use and occupancy of the Site under a Special Use Permit ("SUP") for five years. In return, Krejci III agreed not to "increase in any way the inventory of the present business" and to "make a good faith effort to dispose of all of the present inventory . . . ." (Doc. No. 146, at ex. J-4 at ¶¶ 11–12).

In May of 1986, the National Park Service (the "NPS") received information regarding the possible presence of hazardous

---

to address this issue when it decides the U.S.'s motion for partial summary judgment as to response costs. *See AT & T Global Information Solutions Co. v. Union Tank Car Co.,* 29 F.Supp.2d 857, 862 (S.D.Ohio 1998) (stating "issues of proof related to the necessity and consistency of response costs are properly addressed in the contribution or damages phase of trial.") (citing *Stychno v. Ohio Edison Co.,* 806 F.Supp. 676, 680 (N.D.Ohio 1992) (citing *Southland Corp. v. Ashland Oil Inc.,* 696 F.Supp. 994, 999 (D.N.J.1988); *T & E Indus. Inc. v. Safety Light Corp.,* 680 F.Supp. 696, 708 (D.N.J.1988); *County Line Investment Co. v. Tinney,* 933 F.2d 1508, 1513 (10th Cir.1991))).

4. Section 460ff of the United States Code Title 16 provides:

For the purpose of preserving and protecting for public use and enjoyment, the historic, scenic, natural, and recreational values of the Cuyahoga River and the adjacent lands of the Cuyahoga Valley and for the purpose of providing for the maintenance of needed recreational open spaced

necessary to the urban environment, the Cuyahoga Valley National Park . . . shall be established within six months after December 27, 1974. . . .

16 U.S.C. § 460ff.

5. Section 460ff-1 of Title 16 sets forth the boundaries of the national park and the manner for acquiring the lands within the boundaries of the national park. *See* 16 U.S.C. § 460ff-1.

Section 460ff-2(b) states, "It is the express intent of the Congress that the Secretary should substantially complete the land acquisition program contemplated by this subchapter within six years after December 27, 1974." 16 U.S.C. § 460ff-2(b).

6. Defendant 3M states that Krejci II bought the Site, which was operating as a dump, in 1940. Plaintiff U.S., however, contends that Krejci II began the operation of the Krejci dump in approximately 1951. This discrepancy, however, has no effect on the outcome of the motions pending before the Court.

substances at the Site.[7] In October of 1986, the United States Environmental Protection Agency (the "EPA") conducted a site assessment at the request of the NPS. During this assessment, the EPA sampled drums, soils, sediments, and surface water at the Site. The EPA then began onsite activity in June of 1987, which involved sampling drums and soils, identifying contaminants, segregating and staging the hazardous materials, dewatering and treating an on-site lagoon, removing non-hazardous site materials necessary to facilitate removal of hazardous materials, and removing and disposing of hazardous materials.[8]

The second phase of the removal action was conducted by the NPS, who assumed responsibility for removal work at the Site pursuant to an interagency agreement with the EPA. Phase 2 consisted of the "characterization" and removal of the remaining waste staged during Phase 1.[9] Activities conducted by the NPS consisted of sampling drums and bulk waste piles, performing chemical analyses of those samples, conducting on-site soil gas investigations, and removing approximately 2,000 drums and 4,300 tons of waste from the bulk waste piles. *See id.* Phase 2 was followed by Phase 3, which addressed the unconsolidated waste on the West Tract of the Site. Phase 3 involved characterizing, separating, and removing wastes from the

Site. *See id.* The removal action is currently in Phase 4, during which the NPS is performing a Remedial Investigation/Feasibility Study relating to a long-term remedial action for the Site. The Remedial Investigation is complete, while the Feasibility Study is nearing completion. The U.S. contends that it has incurred costs and expenses in conducting the four phases totaling at least $23,981,563.00.[10]

In April of 1997, the U.S., on behalf of the Secretary of the DOI, filed a complaint in this matter pursuant to Sections 107 and 113(f) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607(a) & 9613(f), seeking recovery of costs incurred for response actions at the Site. The U.S. named as Defendants the following seven corporations: Chrysler Corporation, Ford Motor Company, Kewanee Industries, Inc., Chevron U.S.A., Inc., Minnesota Mining and Manufacturing Company, Waste Management of Ohio, Inc., and The Federal Metal Company. On March 28, 2001, the U.S. lodged with the Court a Partial Consent Decree reached between it and all of the Defendants, with the exception of Defendant 3M and Defendant Ford Motor Company, which provides for the payment of the settling Defendants' equitable share of the cost of the remedial action and the U.S.'s other response costs and for damages for injury to, destruction of, or loss of

7. Defendant 3M argues that NPS knew of the presence of these wastes as early as 1977 when NPS personnel inspected the Site prior to the acquisition of the land. This dispute, however, does not prohibit resolution of the issue regarding liability, although it may be a factor with regard to the determination of response costs. It is too premature, at this point, for the Court to make that determination.

8. The NPS refers to the EPA's removal activities as Phase 1 of the removal action and contends that this phase was not completed until 1990. Defendant 3M, however, states

that the EPA's removal activities ended in approximately May of 1989. The dispute over when the EPA's removal activities concluded is not relevant to the issue of liability and affects, if at all, only the issue of response costs.

9. The U.S. provided the description of the various activities conducted during the phases of cleanup in its memorandum in support of its motion for partial summary judgment as to liability. (*See* Doc. No. 146, at p. 10).

10. Again, Defendant 3M contests this amount and the NPS's ability to recover such amount.

natural resources at the Site. In addition, the U.S. is currently negotiating a settlement with Defendant Ford Motor Company and anticipates lodging a Partial Consent Decree with this Court sometime in September of 2001. Accordingly, only the U.S.'s case against Defendant 3M appears to remain in dispute.

## II. Summary Judgment Standard

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56. When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). However, the adverse party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Rule requires the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). General averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts ... earlier deposition testimony." *Reid v. Sears*

*Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986) (citing *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir.1984)). Further, " '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505.

## III. CERCLA Liability

CERCLA was enacted by Congress in 1980 and is "the primary statutory means by which harmful or potentially harmful hazardous waste disposal sites are remediated." *Centerior Service Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 347 (6th Cir.1998). Parties who incur cleanup costs in remediating a hazardous waste disposal site may seek to recover the response costs by bringing one of two causes of action: (1) a joint and several cost recovery action pursuant to § 107(a) of CERCLA, 42 U.S.C. § 9607(a); or (2) a contribution action pursuant to § 113(f) of CERCLA, 42 U.S.C. § 9613(f)(1). Parties subject to liability under §§ 107(a) and 113(f) are referred to as potentially responsible parties ("PRPs"), and they include: (1) the owner and operator of a waste facility; (2) any previous owner or operator during any time in which hazardous substances were disposed at a waste

facility; (3) any person who arranged for disposal or treatment of hazardous substances at the waste facility; and (4) any person who transported hazardous substances to a waste facility. 42 U.S.C. § 9607(a)(1)-(4).

■ In order to establish a prima facie case under § 107(a), the plaintiff must prove four elements: (1) that the defendant falls within one of the four categories of PRPs; (2) that the site is a facility; (3) that a release or threatened release of hazardous substance has occurred; and (4) that the release has caused the plaintiff to incur response costs. *Centerior*, 153 F.3d at 347–48 (citing *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir.1989); *3550 Stevens Creek Assocs. v. Barclays Bank*, 915 F.2d 1355, 1358 (9th Cir.1990)).[11] Once a prima facie case is established, and absent the existence of a § 107(b) defense, the PRP defendants are strictly liable on a joint and several basis. Accordingly, under this section, a successful plaintiff is entitled to recover the entire costs of remediation from any defendant without having to prove the extent of the defendant's liability. Damages are apportioned according to fault only in the rare circumstance when the defendant can affirmatively prove that the harm is divisible. *See Centerior*, 153 F.3d at 348 (citing *Colorado & Eastern Railroad*, 50 F.3d 1530, 1535

(10th Cir.1995); *New Castle County v. Halliburton NUS Corp.*, 111 F.3d 1116, 1121 n. 4 (3d Cir.1997); *O'Neil v. Picillo*, 883 F.2d 176, 178 (1st Cir.1989)).

■ By contrast, in actions seeking contribution under § 113(f), the plaintiff recovers severally from each liable or potentially liable defendant, and the burden is placed on the plaintiff to establish the defendant's equitable share of response costs.[12] *Centerior*, 153 F.3d at 348 (citations omitted). Sections 107(a) and 113(f) also differ with respect to available defenses.

Section 107(b) lists the defenses that a defendant, held liable under § 107(a), may assert. Under this provision, a defendant can avoid liability by establishing that the release or threat of release of hazardous substances, and damages resulting therefrom, were caused by: (1) an act of God; (2) an act of war; (3) an act or omission of a third party; or (4) any combination of the aforementioned defenses. 42 U.S.C. § 9607(b)(1)-(4). There are no other defenses available to § 107 defendants. On the contrary, Section 113 defendants may assert equitable defenses as courts are expressly permitted to "allocate response costs among liable parties using such equitable factors as the courts determine are appropriate." 42 U.S.C. § 9613(f).

---

**11.** These elements must also be established when seeking contribution under § 113(f) because this section allows a party to seek contribution only from a person who is liable or potentially liable under § 107. *See AT & T*, 29 F.Supp.2d at 862.

**12.** Section 113(f)(1) provides as follows:
Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) [107(a) ] of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims

shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.
42 U.S.C. § 9613(f)(1).

## IV. Discussion

### A. Whether the U.S., an Owner and Operator of the Site, is Limited to an Action for Contribution under § 113(f) to Recover its Response Costs.

Given both the substantive and procedural differences between the two statutes, highly contested debates arise when, as is the case before the Court, the parties dispute which section governs the plaintiff's response costs recovery action. In this case, Defendant 3M argues that, because the NPS is a PRP, the U.S. is limited to an action for contribution under § 113(f). The U.S., however, contends that, because the NPS and the EPA were exercising Presidentially-delegated response authority in cleaning up the Site, it may pursue its claim under § 107.

The question of whether PRPs can pursue a cost recovery action under § 107(a), or whether PRPs are limited to a contribution action under § 113(f) has been hotly debated and has resulted in inconsistency in the federal courts.[13] The controlling case on this issue in this circuit is *Centerior Service Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344 (6th Cir.1998). Accordingly, the Court will begin its analysis with a review of this case.

The issue before the Sixth Circuit in *Centerior* was "whether a party who is itself potentially responsible for the response costs of a hazardous waste cleanup under ... [CERCLA] is permitted to bring a joint and several cost recovery action against other potentially responsible parties ("PRPs") under § 107(a) of CERCLA, or is limited to actions for contribution." *Centerior*, 153 F.3d at 345. The EPA in *Centerior* issued an Administrative Order requiring the plaintiffs—owners and arrangers—to undertake and complete an emergency cleanup of the hazardous waste site.[14] The plaintiffs incurred approximately $9.5 million in costs relating to the cleanup and filed claims seeking to recover these costs against more than 125 defendants. Ten motions were filed by various parties all addressing whether the plaintiffs could assert joint and several cost recovery actions. The district court ruled that the plaintiffs were limited to bringing an action for contribution and certified the question for interlocutory appeal. *Id.* at 346–47.

On appeal, the Sixth Circuit noted that there have been numerous, inconsistent district court decisions on this issue, but that the First, Third, Seventh, Ninth and Tenth Circuits have all held that PRPs are precluded from seeking joint and several cost recovery under § 107(a). *See id.* at 349 (citations omitted). In resolving the issue for Sixth Circuit, the court held:

> Cost recovery actions by parties not responsible for site contaminations are joint and several cost recovery actions governed exclusively by § 107(a). Claims by PRPs, however, seeking costs from other PRPs are necessarily actions for contribution, and are therefore governed by the mechanisms set forth in § 113(f).

---

**13.** *See, e.g.*, Redemann, Robert P. & Michael F. Smith, *The Evolution of PRP Standing under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980*, 21 WM. & MARY ENVTL. L. & POL'Y REV. 300 (1997) (discussing the inconsistency among the federal courts and explaining that, in resolving this issue, some courts focus on whether or not there has been an adjudication of liability with respect to the site prior to the PRP seeking costs).

**14.** Section 106 permits the EPA to issue such an order "when it finds an 'imminent and substantial endangerment to the public health or welfare or environment' due to site contamination." *Centerior*, 153 F.3d at 346 n. 4 (quoting 42 U.S.C. § 9606(a)).

*Id.* at 350. Moreover, the court did not agree with the distinction made by some courts, and urged by the plaintiffs, that only PRPs who have either settled with the EPA or have been adjudged liable under § 107(a) should be limited to actions for contribution. In rejecting this argument, the court stated that, under common law, there was no requirement that a party be adjudged liable and that it was enough that a plaintiff act under some compulsion or legal obligation to an injured party when discharging payment. *Id.* at 351.

While 3M urges that the court's holding in *Centerior* is dispositive of the issue before this Court, the Court disagree on the bases set forth in the ensuing analysis.

A close reading of *Centerior* reveals that the issue before this Court was expressly not addressed by the Sixth Circuit. After rendering its holding, the Sixth Circuit addressed the concerns raised by the plaintiffs that such holding would impede the goals of CERCLA and would contradict a prior Sixth Circuit decision. With regard to the latter, the court stated that its decision in *Velsicol Chemical Corp. v. Enenco, Inc.*, 9 F.3d 524 (6th Cir.1993), did not require an opposite holding. *See Centerior*, 153 F.3d at 355.

In *Velsicol*, the plaintiff performed cleanup activities pursuant to an agreement with the EPA and then filed suit against other PRPs to recover the costs incurred. *Id.* (citing *Velsicol*, 9 F.3d at 526). The district court dismissed the plaintiff's claims based on laches and the statute of limitations. *Id.* (citing *Velsicol*, 9 F.3d at 527). On appeal, the Sixth Circuit reversed the district court and reinstated the § 107(a) cost recovery claim brought by the plaintiff, even though the plaintiff was, itself, a PRP. *Id.* (citing *Velsicol*, 9 F.3d at 529–30).

The court in *Centerior* stated that *Velsicol* did not require an opposite holding because (1) the court in *Velsicol* was not confronted with and did not address the issue before the court in *Centerior*; and (2) *Velsicol* "involved plaintiffs who apparently had initially joined forces with the EPA and state and local government authorities to plan the site cleanup without governmental prodding." *Id.* (citing *Velsicol*, 9 F.3d at 529). As such, the court stated that the case in *Velsicol* "more closely parallels the question we *do not address here*, whether a plaintiff PRP who voluntarily initiates a cleanup may nevertheless bring a joint and several cost recovery action." *Id.* at 355–56 (emphasis added).[15] In light of the questions left unanswered by the court in *Centerior*, 3M's argument that the U.S. is precluded from pursuing a joint and several cost recovery action solely because it is a PRP does not sufficiently address the issue.

### 1. Whether an Exception for "Volunteers" Exists under *Centerior*

The Sixth Circuit has not revisited the questions left unanswered in *Centerior*. However, several district courts within this circuit have addressed the issue of whether "volunteer" or "truly innocent" PRPs may recover response costs under § 107(a). The Court will briefly review these decisions.

In *Great Lakes Container Corp. v. Columbus Steel Drum Co., Inc.*, 54 F.Supp.2d 706 (E.D.Mich.1999), Mallinckrodt Group, Inc. ("MGI"), the third-party PRP plaintiff, sought to circumvent the holding in *Centerior* and recover response costs from

---

**15.** This unanswered question actually states, more precisely, the issue presently before this Court. The Sixth Circuit also left unanswered the question of whether parties who, by definition are PRPs, but who are truly innocent, may seek joint and several cost recovery. *See Centerior*, 153 F.3d at 354.

approximately 130 other parties under § 107(a), arguing that it had undertaken a voluntary cleanup of the site, or, alternatively, was a truly innocent owner. *Great Lakes Container Corp. v. Columbus Steel Drum Co., Inc.*, 54 F.Supp.2d 706, 707 (E.D.Mich.1999). The court, however, rejected both arguments. Although the court does not provide any details with respect to the cleanup activities at the site, the court does state that MGI is a defendant in an action brought by the State of Michigan and others for cleanup costs and that it is undisputed that MGI has not undertaken a voluntary cleanup of the site. *Id.* at 707–08. With regard to the innocent owner defense, the court recited the elements of the defense and concluded that MGI could not establish that it was "truly innocent."

■ The remaining two cases addressed only the innocent landowner defense. *See Advanced Tech. Corp. v. Eliskim, Inc.*, 87 F.Supp.2d 780 (N.D.Ohio 2000); *Containerport Group, Inc. v. Am. Fin. Group, Inc.*, 128 F.Supp.2d 470 (S.D.Ohio 2001). This defense was created in 1986 with the enactment of Superfund Amendments and Reauthorization Act ("SARA"). To escape liability under this defense a PRP must show, by a preponderance of the evidence, that: (1) a party other than the PRP was the sole cause of the release of the hazardous substances; (2) the PRP acquired the property after the hazardous substances were disposed of there; (3) the PRP did not actually know about the presence of the hazardous substance at the time of acquisition; (4) the PRP undertook appropriate inquiry when it acquired the property, in order to minimize its liability; and (5) the PRP exercised due care once the hazardous substance was discovered. *Advanced Tech. Corp.*, 87 F.Supp.2d at 785 (citing CERCLA §§ 107(a)-(b), 101(35)(A)); and *M & M Realty Co. v. Eberton Terminal Corp.*, 977 F.Supp. 683, 687 (M.D.Pa.1997); *see also Container-*

*port,* 128 F.Supp.2d at 479 (citations omitted).

■ Based on the undisputed facts of the case at bar, the U.S. could not assert the innocent landowner defense. The NPS acquired the Site knowing it was contaminated and with the purpose of remediating the Site and making it a part of the Cuyahoga Valley National Park. As a result of this knowledge, the U.S. cannot establish the third element, and the Court need not address the remaining elements.

The question that remains, however, is whether the U.S., a volunteer PRP, can recover its response costs under § 107(a) as opposed to § 113(f). The Sixth Circuit, in leaving this question unanswered, did not necessarily indicate its acceptance of this result. Accordingly, this question is best resolved by first examining the court's basis for its decision in *Centerior*.

The *Centerior* court explained its reasoning by first defining the term "contribution" under both the common law and CERCLA. *See Centerior*, 153 F.3d at 350–51. Based on these definitions, the court concluded that the claim pleaded by the plaintiffs was one for contribution because they had a legal obligation to conduct the site cleanup. Furthermore, the court noted that, under the common law, there was no requirement that a party be adjudged liable before seeking contribution. Rather, it is enough that "a plaintiff act under some compulsion or legal obligation . . . ." *Id.* at 351. The plaintiffs in *Centerior* acted pursuant to an administrative order, which the court said clearly satisfied such a requirement. *Id.* at 352.

The court also rejected the plaintiffs' argument that the court's holding impeded the goals of CERCLA, which include ensuring prompt and efficient cleanup of hazardous waste sites and placing the costs of those cleanups on the PRPs. *Id.* at 353 (quoting *U.S. v. Akzo Coatings of Am.*, 949 F.2d 1409, 1417 (6th Cir.1991)). Contrary

to ensuring prompt and efficient cleanup, the plaintiffs were forced to initiate a site cleanup under the compulsion of an administrative order. The court also stated that there is still an incentive for quick cleanup because, under § 113, the court can consider the degree of cooperation of the parties with the government in allocating response costs between the parties. *Id.* at 354 (citing 42 U.S.C. § 9613(f)(1); *Amoco Oil v. Borden, Inc.,* 889 F.2d 664, 672–73 (5th Cir.1989)).

◼ Permitting volunteer PRPs, like the U.S. in this case, to pursue cost recovery actions under § 107 would not circumvent the Sixth Circuit's holding in *Centerior.* The NPS was not legally obligated to clean up the Site. To the contrary, the NPS obtained ownership of the Site, and thereby became a PRP, in order to clean-up the Site and designate it part of the Cuyahoga Valley National Park.[16] Accordingly, this is not a " 'quintessential' " action for contribution (*i.e.,* this is not the situation where the plaintiff had a legal obligation to conduct the site cleanup, which it did and in so doing, it paid more than its fair share of the obligation and now seeks costs for the cleanup from other PRPs who did not contribute their pro rata share), and the U.S. may pursue its response costs recovery action under § 107(a). *Centerior,* 153 F.3d at 351 (citing *U.S. v. Colorado & Eastern Railroad Co.,* 50 F.3d 1530, 1536 (10th Cir.1995); *Akzo Coatings Inc. v. Aigner Corp.,* 30 F.3d 761, 764 (7th Cir.1994)).

## 2. Whether an Exception to *Centerior* Exists for Federal PRPs.

The U.S. argues that this case is distinguishable from *Centerior* on an additional ground—the status of the PRP, as the PRP in *Centerior* was a private company while the NPS is a federal PRP.

This Court is not the first federal court to address the issue of whether federal, or governmental, PRPs are similarly limited to § 113 actions. In fact, most courts that have addressed this exact issue have created exceptions for federal, or governmental, PRPs thereby permitting them to obtain full cost recovery under § 107 despite their PRP status.[17] *See, e.g., U.S. v. Hunter,* 70 F.Supp.2d 1100, 1108 (C.D.Cal. 1999) (permitting the U.S. government, an alleged arranger, to proceed under § 107); *Town of Wallkill v. Tesa Tape,* 891 F.Supp. 955, 959 (S.D.N.Y.1995) (distinguishing a First Circuit decision limiting private PRPs to § 113 contribution action on the basis that a town nor any other governmental entity was involved in the case before the First Circuit); *U.S. v. Kramer,* 757 F.Supp. 397, 414 (D.N.J.1991) (holding that the federal government, an alleged PRP, is entitled to full recovery of cleanup costs despite its potential liability for contribution); *U.S. v. Western Processing Co.,* 734 F.Supp. 930, 939–40 (W.D.Wash.1990) (holding that, although the U.S. was a former site operator, it may proceed under § 107). However, this is-

---

**16.** The Court recognizes Defendant 3M's argument that the NPS permitted or arranged for the disposal of hazardous wastes during its ownership. The Court, however, is not persuaded to limit the U.S. to an action for contribution based on this activity. The disposal of hazardous wastes, if any, occurred as a result of the settlement agreement reached between the U.S. and the former owner of the land whereby the U.S. acquired the land. Krejci III was permitted to continue his oper-

ations, with restrictions, for a period of five years. Moreover, Krejci III's operations were monitored by park officials during this period of time.

**17.** *See* LeVerrier, Dianne K., *Are Some Polluters more Equal than Others? A Critique of Caselaw Establishing Preferential Treatment of Federal Potentially Responsible Parties (PRPs) Under CERCLA,* 17 Touro L. Rev. 503 (2001).

sue has not been addressed by the Sixth Circuit or any district court within this circuit.

■ Those courts that distinguish between federal and private PRPs have done so based primarily on the legislative history of the SARA and a "public monies" rationale. The legislative history often cited provides as follows:

> This section [§ 113] does not affect the right of the United States to maintain a cause of action for cost recovery under Section 107 or injunctive relief under Section 106, whether or not the United States was an owner or operator of a facility or a generator of waste at the site. Where the United States has been required to pay response costs as a generator or facility owner or operator, the United States may maintain an action to recover such costs from other responsible parties.

H.R. REP. NO. 99–235(I) at 79–80 (1985), reprinted in 1986 U.S.C.C.A.N. 2835, 2861–62. The public monies rationale is that the government PRP has spent public monies on the cleanup and, therefore, is entitled to full recovery, regardless of its potential liability. *See U.S. v. Kramer*, 757 F.Supp. 397, 414 (D.N.J.1991). This Court finds both arguments persuasive as applied to the facts of this case.

The U.S. does not dispute the NPS's role as a PRP. Moreover, it concedes that Defendant 3M has a valid counterclaim against the U.S. for contribution. In addition, Defendant 3M does not dispute that it is liable for the response costs incurred by the EPA as the EPA was not operating as the owner of the Site. Had the EPA conducted all phases of the cleanup, the Court can assume that Defendant 3M would not dispute the EPA's ability to pursue an action to recover its costs under § 107. The Court, however, is unwilling to develop a distinction between two federal agencies that conducted cleanup activities, and thereby limit the U.S.'s ability to recover response costs incurred, solely because one of the agencies obtained ownership of the Site pursuant to a Congressional mandate.

Whether all federal PRPs should be entitled to pursue response costs recovery actions under § 107 is not a question this Court need address. In the present case, the role of the NPS is unique in that it obtained the Site pursuant to a Congressional mandate and solely for a limited purpose (*i.e.*, to preserve and protect the public use and enjoyment of the land as an historic, scenic, natural, and recreational resource).[18] (*See* Doc. No. 172, at stmt.8). Moreover, the undisputed facts establish that, once the NPS obtained full rights to the property (*i.e.*, Krejci III's SUP expired), all disposal activity ceased.[19]

The Court holds that the facts of this case are distinguishable from *Centerior* based on both the NPS's status as a volunteer and the unique facts surrounding the NPS's ownership of the Site and that allowing the U.S. to proceed under § 107 is

18. The U.S. does not dispute that this was its purpose for originally acquiring the land. However, the U.S.'s purpose years later in conducting the CERCLA cleanup was to protect human health and the environment. (*See* Doc. No. 172, at stmt. 22).

19. This Branch of the Court presided over a number of appropriation hearings in the early 1980s, and the Court takes judicial notice of the fact that Congress appropriates only a limited amount of money for use in acquiring property for parks. *See* 16 U.S.C. § 460ff–5 (authorizing $70,100,000 to be appropriated for the acquisition of land).

The settlement agreement reached between the U.S. and Krejci III provided for the payment of a set amount by the U.S. to Krejci III and for the grant of an SUP to Krejci III. The U.S. was able to reach a settlement with Krejci III, which avoided the need for a trial to determine the "just compensation" for this land. Accordingly, the SUP was used as a negotiating tool in this case.

not in conflict with the reasons underlying the court's decision in *Centerior*, Defendant 3M's motion for partial summary judgment on this issue is denied.

### B. Whether Defendant 3M is Exempt from Liability under § 107(b)(3).

#### 1. The U.S.'s Prima Facie Case

As discussed in *supra* Part II, the U.S. must establish a prima facie case under § 107(a) in order to hold Defendant 3M liable for the response costs incurred by the U.S. To establish a prima facie case, the U.S. must prove the following: (1) that Defendant 3M falls within one of the four categories of PRPs; (2) that the Site is a facility; (3) that a release or threatened release of hazardous substance has occurred on the Site; and (4) that the release has caused the U.S. to incur response costs. *Centerior*, 153 F.3d at 347–48 (citing *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir.1989); *3550 Stevens Creek Assocs. v. Barclays Bank*, 915 F.2d 1355, 1358 (9th Cir.1990)). Once a prima facie case is proven, Defendant 3M will be held strictly liable on a joint and several basis unless it can establish, by a preponderance of the evidence, one of the three defenses enumerated in § 107(b).

Defendant 3M, in its response to the U.S.'s motion for partial summary judgment as to liability, does not address the elements necessary to establish a prima facie case. No objection being made to the U.S.'s ability to establish its prima facie case, the Court will address the elements only briefly.

First, the U.S. must prove that Defendant 3M is a PRP. The undisputed facts establish, and 3M concedes, that 3M is liable as an "arranger" under CERCLA § 107(a)(3).[20] *See supra* Part III. Second, there is no question that the Krejci dump site is a facility. (*See* Doc. No.161 at stmt.13). Third, in its response to the U.S.'s statement of undisputed facts, Defendant 3M does not contest that the metals barium, copper, chromium, lead, silver and zinc have been released into the environment at the Site and remain in the soil. (*See* Doc. No. 161, at stmt.39). Finally, Defendant 3M does not dispute that the U.S. has incurred response costs—it only disputes the amount incurred and the amount recoverable under § 107(a).

■ Defendant 3M's predecessor, Di-Noc, *arranged* for the disposal of hazardous substances at the Site. Arranger liability attaches upon proof of two elements: (1) that the generator arranged for treatment or disposal of hazardous substances (2) at a facility that now contains the same type of hazardous substances disposed of by the generator. *See U.S. v. Mottolo*, 695 F.Supp. 615, 625 (D.N.H.1988); *U.S. v. Wade*, 577 F.Supp. 1326, 1333 (E.D.Pa. 1983). The U.S. has established the existence of successor liability under the doctrines of de facto merger and statutory merger. Moreover, Defendant 3M does not dispute that successor liability exists; rather, 3M argues that it can establish a defense to liability. Accordingly, the Court will not review the law surrounding successor liability under CERCLA.[21]

---

**20.** Section 107(a)(3) provides as follows:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section ... any person who by contract, agreement, or otherwise *arranged* for disposal or treatment, or *arranged* with a transporter for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility

or incineration vessel owned or operated by another party and containing such hazardous substances ... shall be liable for ... all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan ....

42 U.S.C. § 9607(a)(3) (emphasis added).

**21.** In addition, the remainder of this opinion will not distinguish between Di–Noc and 3M.

Based on the foregoing, the U.S. has established a prima facie case under § 107(a), and Defendant 3M will be held liable, absent the existence of a defense under § 107(b).

### 2. 3M's Third Party Defense under § 107(b)(3)

Defendant 3M asserts a defense under § 107(b)(3), which provides as follows:

There shall be no liability under subsection (a) of this section for a person *otherwise liable* who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substances and the damages resulting therefrom were caused solely by ... an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions ....

42 U.S.C. § 9607(b) (emphasis added). Accordingly, Defendant 3M bears the burden of pleading and proving, by a preponderance of the evidence, the following three elements: (1) that another party was the sole cause of the release of hazardous substances and the damages caused thereby; (2) that the other, responsible party did not cause the release in connection with a contractual, employment or agency relationship with the defendant; and (3) that 3M exercised due care and guarded against the foreseeable acts or omissions of the responsible party. *See U.S. v. Meyer*, 120 F.Supp.2d 635, 640 (W.D.Mich. 1999) (citing *Westfarm Associates v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669, 682 (4th Cir.1995)). Defendant 3M's failure to meet its burden on any one of the required elements precludes the application of the defense. *See U.S. v. A & N Cleaners & Launderers, Inc.*, 854 F.Supp. 229, 239 (S.D.N.Y.1994).

Defendant 3M contends (1) that the response costs were incurred at the Site due to the acts or omissions of the NPS, which is not an agent or an employee of 3M and with which 3M had neither an implied nor a direct contractual relationship; (2) that it exercised due care with respect to its waste materials; and (3) that the acts of the NPS were the proximate cause of the release and that, therefore, the NPS is solely the cause of the release. (*See* Doc. No. 160, at p. 5).

In support of its argument, Defendant 3M states that, when the NPS acquired the Site, it knew it was acquiring an "open dump," and it, therefore, was required to comply with a Congressional mandate to close the Site. *See* The Resource Conservation and Recovery Act, 42 U.S.C. § 43(a)(3). Ohio also had regulations regarding the cleanup and closure of open dumps, which Defendant 3M states the NPS neglected. *See, e.g.,* Ohio Solid Waste Disposal Regs., 1976 Ohio Admin. Code § 3745–27–01 *et seq.;* O.R.C. § 3734 .03 (Anderson 1970). Defendant 3M contends that the NPS did not comply with these regulations and requirements and that the releases claimed in this case would not have occurred absent the NPS's noncompliance, as the NPS's noncompliance was the sole cause of the releases at issue. According to 3M, additional releases occurred at the hands of the NPS who ordered a salvager to crush drums in a metal crusher and move waste materials around the Site thereby causing spills.

Defendant 3M also states that it took appropriate precautions with respect to its waste materials. By 1958, 3M submits that it was sending its scrap inks and waste thinners for recycling, even though such recycling was not encouraged or mandated until decades later. In addition, the plant trash 3M disposed of was not unlike that commonly disposed of by households and commercial businesses during the early 1960s and even today. Defendant 3M argues that there is no evidence that "due care" would require more.

Finally, Defendant 3M asserts that the later acts of the NPS were not foreseeable. Stated more particularly, 3M argues that it was not foreseeable that the NPS would not comply with federal and state regulations requiring it to close the Site and, instead, allow the former owner to continue operating the Site for five years.

The NPS counters arguing that it is not the sole cause, if a cause at all, of the releases at the Site. First, the NPS points to the undisputed fact that states that releases took place during the 1950s and 1960s—long before it acquired the Site. (*See* Doc. No. 172, at stmt.26). Second, the NPS contends that Joe Danto, an independent hauler, is responsible for some of the releases that occurred at the Site. Moreover, because Defendant 3M had a contractual relationship with Mr. Danto to haul wastes for disposal during the period of 1940 to 1960, the U.S. argues that Defendant 3M cannot prove all of the necessary elements to invoke the defense. Finally, the U.S. argues that it was not the cause of any releases at the Site. Accord-

ing to the U.S., disposal activity by Krejci III following acquisition of the property by the NPS in 1980 was strictly prohibited and, although some disposal activity did occur, it was reported to the NPS Rangers who, in turn, filed incident reports regarding the prohibited activity. Regardless, the U.S. submits that it was not the *sole* cause.

Defendant 3M bases its argument that the U.S. was the sole cause of the releases on an interpretation of "sole cause" that is synonymous with "proximate cause." In *Lincoln Properties, Ltd. v. Higgins*, 823 F.Supp. 1528 (E.D.Cal.1992), the court interpreted the phrase "sole cause." Finding little guidance in the statute, case law or legislative history, the court relied on case law interpreting the sole cause language of the Clean Water Act. *Id.* at 1540. Although the case law interpreting this language was inconsistent, the court adopted one of the three approaches and held that " 'caused solely by,' as used in CERCLA, incorporates the concept of proximate or legal cause." *Id.* at 1542. Accordingly, to invoke this defense, 3M's conduct must have been (1) unforeseeable and (2) indirect and insubstantial in the chain of events leading to the release.

The Sixth Circuit has not addressed the "solely caused by" language of CERCLA; however, two district courts within this circuit have applied the interpretation reached by the court in *Lincoln Properties* in analyzing the elements of the third party defense.[22] Nevertheless, it is not necessary for this Court to analyze the correctness of that interpretation because Defendant 3M cannot meet its burden on

---

**22.** *See Advanced Tech. Corp. v. Eliskim, Inc.,* 96 F.Supp.2d 715, 718 (N.D.Ohio 2000) (applying third party defense to innocent landowner whose conduct was a but for cause of the release because landowner's release was unforeseeable and indirect and insubstantial in the chain of events leading to the release

and citing holding of *Lincoln Properties*); *U.S. v. Meyer,* 120 F.Supp.2d 635, 640 (W.D.Mich.1999) (stating "[a] party may meet the first element of the [third party] defense by demonstrating that he or she was not the 'proximate cause' of the release.").

all of the elements of this defense, thereby precluding its application.

Even if this Court were to adopt the interpretation of "solely caused by" as expressed in *Lincoln Properties*, Defendant 3M has failed to put forward evidence that would create a dispute as to a material fact that supports its propositions that (1) it was not a proximate cause of the releases and (2) the releases did not occur in connection with a contractual relationship between 3M and the third party. Accordingly, the first and second elements of the third party defense have not been established.

Unlike the situation in *Lincoln Properties*, there are no specific facts that establish a genuine issue for trial as to whether the conduct of Defendant 3M contributed to the releases and whether such releases were foreseeable. In addition, 3M has not proven that its conduct was indirect *and* insubstantial. Even if 3M's conduct had not *directly* contributed to the releases, the undisputed facts indicate that the conduct of Joe Danto did contribute to the releases, and that Joe Danto had a contractual relationship with 3M to haul waste materials.[23] (*See* Doc. No. 161, at stmt.89).

Based on the foregoing, Defendant 3M is unable to invoke the third party defense under § 107(b)(3). As a result, Defendant 3M remains strictly liable on a joint and several basis for the response costs incurred by the U.S. in cleaning up the Site—subject to the provisions of § 107(a).[24]

## V. Conclusion

Based on the foregoing, the U.S. is permitted to proceed with its action for recovery of response costs under § 107(a). Accordingly, Defendant 3M's motion for partial summary judgment (Doc. No. 139) is DENIED with respect to this issue only. Defendant 3M also raises an issue regarding response costs, which the Court will address in a later opinion. In addition, the U.S.'s motion for partial summary judgment as to liability (Doc. No. 145) is GRANTED.

IT IS SO ORDERED.

---

**23.** Defendant 3M admits that Joe Danto hauled some waste materials for 3M until 1961.

**24.** Section 107(a) provides that Defendant 3M is liable for the following:

  (A) all costs of removal or remedial action incurred by the United States Government ... not inconsistent with the national contingency plan;

  (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

  (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

  (D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

42 U.S.C. § 9607(a)(4)(A)-(D).

  The U.S. has moved for partial summary judgment as to response costs. The Court will address the issue of response costs in a separate opinion.